Nos. 22-5884 / 22-5912

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT
_____

CHELSEY NELSON PHOTOGRAPHY LLC, ET AL.,

*Plaintiffs-Appellees and Cross-Appellants*

v.

LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT, ET AL.

*Defendants-Appellants and Cross-Appellees*
_____

On Appeal from the United States District Court
for the Western District of Kentucky
Case No. 3:19-cv-00851
_____

**FIRST BRIEF OF APPELLANTS / CROSS-APPELLEES
LOUISVILLE-JEFFERSON COUNTY, KY METRO GOVERNMENT, ET AL.**
_____

John F. Carroll, Jr.
ASST. JEFFERSON COUNTY ATTORNEY
MICHAEL J. O'CONNELL
JEFFERSON COUNTY ATTORNEY
200 South 5th St., Suite 300N
Louisville, KY 40202
(502) 574-6321
john.carroll2@louisvilleky.gov

Casey L. Hinkle
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main St., 4th Floor
Louisville, KY 40202
(502) 416-1636
chinkle@kaplanjohnsonlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................1

STATEMENT OF JURISDICTION...........................................................1

STATEMENT OF ISSUES .........................................................................1

STATEMENT OF THE CASE.....................................................................2

I.    Louisville's Prohibition of Discrimination Based on Sexual Orientation.......4

II.    Nelson's Attempt to Manufacture Standing ...................................7

III.    Procedural History ...........................................................10

SUMMARY OF THE ARGUMENT ......................................................11

ARGUMENT ...........................................................................13

I.    The District Court Erred in Deciding that Nelson Has Standing to Pursue Her Claims ...........................................................13

II.    The District Court Erred in Deciding that Nelson's Claims Are Ripe..........21

III.    The District Court Erred in Deciding that Enforcement of the Ordinance Violates Nelson's First Amendment Right to Free Speech..........................23

    A.  The Ordinance Regulates Nelson's Conduct, Not the Content of Her Speech....................................................................23

    B.  The Ordinance Is Not Content- or Viewpoint- Based........................27

    C.  Any Burden on Expression Is Incidental to the Ordinance's Regulation of the Conduct of Providing Goods and Services ...........31

    D.  The Ordinance Satisfies Any Level of Scrutiny .................................34

    E.  The Free Speech Clause Does Not Protect a Public Accommodation's Right to Publish Its Unlawful Policy of Discrimination....................40

IV.   The District Court Erred in Deciding that Enforcement of the Ordinance Violates Nelson's Rights Under KRFRA ......................................................41

V.    The District Court Erred in Granting Nelson's Motion to Exclude Expert Testimony from Prof. Barak-Corren ..............................................................44

    A. Prof. Barak-Corren's Opinion is Sufficiently Reliable ......................45

    B. Prof. Barak-Corren's Opinion is Relevant ..........................................51

CONCLUSION .............................................................................................................53

CERTIFICATE OF COMPLIANCE .........................................................................54

CERTIFICATE OF SERVICE ...................................................................................54

ADDENDUM ................................................................................................................55

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
142 S. Ct. 1106 (2022) ......................................................................13

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ..........................................................................31

*Ammex, Inc. v. Cox*,
351 F.3d 697 (6th Cir. 2003) ............................................................21

*Babbitt v. Farm Workers*,
442 U.S. 289 (1979) ....................................................................14, 21

*Barber v. Bryant*,
193 F. Supp. 3d 677 (S.D. Miss. 2016) ............................................38

*Best v. Lowe's Home Centers, Inc.*,
563 F.3d 171 (6th Cir. 2009) ............................................................45

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987) ....................................................................24, 27

*Bostock v. Clayton Cnty., Ga.*,
140 S. Ct. 1731 (2020) ......................................................................31

*Brown v. Board of Ed. of Topeka, Shawnee County, Kan.*,
347 U.S. 483 (1954) ..........................................................................52

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) ....................................................................43, 52

*Christian Legal Soc. Chapter of the University of California, Hastings College of the Law v. Martinez*,
561 U.S. 661 (2010) ..........................................................................28

*Church of the Lukumi Babalu Aye Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ..........................................................................27

*Crouch v. John Jewell Aircraft, Inc.*,
2016 WL 157464 (W.D. Ky. Jan. 12, 2016)............................................51

*Cutter v. Wilkinson*,
544 U.S. 709 (2005)............................................43

*Daniel v. Paul*,
395 U.S. 298 (1969)............................................37

*Elane Photography, LLC v. Willock*,
309 P.3d 53 (N.M. 2013) ............................................26, 30, 32

*Emilee Carpenter, LLC v. James*,
575 F. Supp. 3d 353 (W.D.N.Y. 2021)............................................20

*Fischer v. Thomas*,
52 F.4th 303 (6th Cir. 2022) ............................................18

*Fulton v. City of Philadelphia, Pennsylvania*,
141 S. Ct. 1868 (2021)............................................52

*Heart of Atlanta Motel, Inc. v. United States*,
379 U.S. 241 (1964)............................................24

*Heckler v. Mathews*,
465 U.S. 728 (1984)............................................36-37

*Hishon v. King & Spalding*,
467 U.S. 69 (1984)............................................25

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
515 U.S. 557 (1995)............................................28, 30-32, 35

*Hyman v. City of Louisville*,
53 Fed. Appx. 740 (6th Cir. 2002)............................................17

*Johnson v. Manitowoc Boom Trucks, Inc.*,
484 F.3d 426 (6th Cir. 2007) ............................................46

iv

*Kentucky Press Ass'n, Inc. v. Kentucky*,
454 F.3d 505 (6th Cir. 2006) ..................................................................21

*Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*,
588 F.3d 908 (6th Cir. 2009) ..................................................................44

*Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc.*
*v. City of Lakewood, Ohio*,
699 F.2d 303 (6th Cir. 1983) ..................................................................44

*Love v. Beshear*,
989 F. Supp. 2d 536 (W.D. Ky. 2014)....................................................35

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................................13

*Madsen v. Women's Health Center, Inc.*,
512 U.S. 753 (1994)........................................................................... 29-30

*Maryville Baptist Church, Inc. v. Beshear*,
957 F.3d 610 (6th Cir. 2020) ..................................................................42

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*,
138 S. Ct. 1719 (2018).......................................................22, 27, 35, 40

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016) ..................................................................14

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974)................................................................................34

*Muller v. State of Oregon*,
208 U.S. 412 (1908)................................................................................52

*Nat'l Rifle Ass'n of Am. v. Magaw*,
132 F.3d 272 (6th Cir. 1997) ..................................................................21

*Newman v. Piggie Park Enters., Inc.*,
390 U.S. 400 (1968)................................................................................24

*N.Y. State Club Ass'n, Inc. v. New York*,
487 U.S. 1 (1988) ..................................................................24

*Parrett v. American Ship Bldg. Co.*,
990 F.2d 854 (6th Cir. 1993) .........................................23, 41

*Phillips v. Martin Marietta Corp.*,
400 U.S. 542 (1971) ..............................................................31

*Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*,
822 F.2d 1390 (6th Cir. 1987) ..............................................18

*Platt v. Board of Com'rs on Grievances and Discipline of Ohio Supreme Court*,
769 F.3d 447 (6th Cir. 2014) ..........................................18, 23

*Plunderbund Media, L.L.C v. DeWine*,
753 Fed. Appx. 362 (6th Cir. 2018) ......................................15

*R.A.V. v. City of St. Paul, Minn.*,
505 U.S. 377 (1992) ..............................................................29

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) ............................................24, 29, 35, 37, 40

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006) ............................................25, 27, 33, 40

*Runyon v. McCrary*,
427 U.S. 160 (1976) ..............................................................24

*South Ridge Baptist Church v. Industrial Com'n of Ohio*,
911 F.2d 1203 (6th Cir. 1990) ..............................................43

*Spence v. Washington*,
418 U.S. 405 (1974) ..............................................................26

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ..............................................14-15, 18, 20-21

vi

*Sutherland v. Kentucky Dep't of Corrections*,
2022 WL 17365886 (Ky. App. Dec. 2, 2022) ........................................42

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021)........................................................................38

*Telescope Media Group v. Lucero*,
2021 WL 2525412 (D. Minn. Apr. 21, 2021)........................................20

*Texas v. Johnson*,
491 U.S. 397 (1998)............................................................................26

*Thomas v. Union Carbide Agric. Prods. Co.*,
473 U.S. 568 (1985)............................................................................21

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)........................................................................13

*United States v. O'Brien*,
391 U.S. 367 (1967)............................................................................25

*United States v. Schmucker*,
815 F.2d 413 (6th Cir. 1987) ..............................................................43

*United States v. Sullivan*,
246 F. Supp. 2d 696 (E.D. Ky. 2003) ..................................................51

*Universal Life Church Monastery Storehouse v. Nabors*,
35 F.4th 1021 (6th Cir. 2022) ..............................................................13

*Updegrove v. Herring*,
2021 WL 1206805 (E.D. Va. Mar. 30, 2021)...................... 15, 16, 18-20

*W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*,
300 F. Supp. 2d 600 (W.D. Tenn. 2004) ..............................................45

*W. Va. Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)............................................................................33

*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) ............................................................................27, 29

*Wooley v. Maynard*,
430 U.S. 705 (1977) ....................................................................................33

## Statutes, Rules, and Ordinances

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

28 U.S.C. § 1343 ...........................................................................................1

28 U.S.C. § 1367 ...........................................................................................1

42 U.S.C. § 3604 .........................................................................................40

Federal Rule of Evidence 702 ..............................................................45, 51

Jefferson Fiscal Court Ordinance No. 36, Series 1999 ................................4

KRS Chapter 67C ..........................................................................................5

KRS 344.230 ..........................................................................................6, 17

KRS 446.350 ..................................................................................... 2, 41-42

Louisville Metro Ordinance § 32.760 ......................................................5, 6

Louisville Metro Ordinance § 32.761 .........................................................6

Louisville Metro Ordinance § 92.01 ........................................................2, 5

Louisville Metro Ordinance § 92.05 ................................................. 2-3, 36

Louisville Metro Ordinance § 92.08 ......................................................6, 17

Louisville Metro Ordinance § 92.09 .........................................................6

Miss. Code. Ann. § 11-62-5 .......................................................................38

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Louisville Metro respectfully requests oral argument in this case, which would assist the panel in resolving the questions of constitutional law presented by this appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, 1367. The court entered judgement in favor of Appellees on September 2, 2022. Appellants timely appealed on September 29, 2022. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether Plaintiffs/Appellees have demonstrated a credible threat of enforcement sufficient to confer pre-enforcement standing where they have never been subject to any enforcement activity and there is no evidence to suggest they would ever be presented with an opportunity to violate the statute?

2.      Whether prudential considerations demand dismissal of a pre-enforcement challenge as unripe where the circumstances leading to enforcement may never occur and the nuances of the anticipated violation of the statute are relevant to the constitutional analysis of her claims?

3.      Whether a wedding photographer can evade compliance with a neutral and generally applicable public accommodations law based on her religious objection to same-sex marriage?

1

4.    Whether Plaintiffs/Appellees can assert a pre-enforcement challenge to a public accommodations law under Kentucky's Religious Freedom Restoration Act (KRS 446.350) ("KRFRA") where their religious observance has not been burdened?

5.    Whether the District Court abused its discretion in excluding expert opinion based on disagreement with the expert's methodology for conducting a field experiment and disregard of the relevance of the expert's opinion?

## STATEMENT OF THE CASE

Chelsey Nelson[1] is a wedding photographer who filed this litigation to challenge the constitutionality of Louisville Metro's[2] antidiscrimination law, which prohibits discrimination in employment, housing, and the provision of goods and services (public accommodations). *See* Louisville Metro Ordinance § 92.01, *et seq.* Specifically, Nelson challenges:

> The "Accommodations Provision," which makes it "an unlawful practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation . . . on the ground of . . . sexual orientation . . ."; and

> The "Publication Provision," which makes it "an unlawful practice for a person, directly or indirectly, to publish, . . . [a] communication, notice, or advertisement, which indicates that the goods, services,

---

[1] This litigation was filed by Chelsey Nelson, individually, and her photography business Chelsey Nelson Photography LLC (collectively, "Nelson").

[2] "Louisville Metro" means Defendant-Appellant Louisville-Jefferson County, KY Metro Government.

2

facilities, privileges, advantages, and accommodations of a place of public accommodation . . . will be refused, withheld, or denied an individual on account of his [or her] . . . sexual orientation . . . or that patronage of, or presence at, a place of public accommodation . . . of an individual on account of his [or her] . . . sexual orientation . . . is objectionable, unwelcome, unacceptable, or undesirable."

Louisville Metro Ordinance § 92.05(A) & (B) (collectively, the "Ordinance"). A complete copy of Louisville's antidiscrimination law was filed with the District Court as RE 97-1.

However, this case is not about Chelsey Nelson. Nelson has never been asked to photograph a same-sex wedding and there is no realistic possibility that she ever would be asked to photograph a same-sex wedding. She advertised her religious beliefs in a way that did not violate Louisville's anti-discrimination law for years before being recruited to join this lawsuit by counsel for Plaintiffs/Appellees. Nelson has photographed just 11 weddings total.

This is a manufactured dispute designed to create precedent for using religion as an excuse not to provide commercial services to all members of the Louisville Metro community. Under the District Court's ruling, any service provider who can claim that their product or service is expressive or creative would be entitled to an exemption from antidiscrimination laws. Such an exemption would be as unworkable as it is expansive, as courts have yet to define the scope of services and products that could be considered expressive. Despite Nelson's claims, this is not a harmless exercise. Granting religious exemptions to antidiscrimination laws

3

increases real-world discrimination. No exemption is warranted here. Nelson has no standing and Louisville Metro's antidiscrimination law does not abridge Nelson's constitutional rights.

## I.   Louisville's Prohibition of Discrimination Based on Sexual Orientation

Before sexual orientation was added as a protected class in Louisville's anti-discrimination law, Louisville's Human Relations Commission ("HRC") started tracking receipt of complaints of discrimination on the basis of sexual orientation. *See* Excerpts from HRC Annual Reports from 1985-1993, RE 97-2, PageID # 3861-3879. In 1999, both Louisville and Jefferson County, before merger, amended their respective anti-discrimination ordinances to include a prohibition on employment discrimination on the basis of sexual orientation. Before Jefferson County's legislators voted to add sexual orientation as a protected class, they heard testimony from numerous citizen witnesses, who testified both for and against passage of the law, including personal accounts from citizens who had experienced discrimination on the basis of sexual orientation. *See*, *e.g.*, Excerpts of Citizen Testimony, RE 97-3, PageID # 3880-3891. Later that year, the prohibition of discrimination on the basis of sexual orientation was expanded to include discrimination in housing and public accommodations. *See* Jefferson Fiscal Court Ordinance No. 36, Series 1999, RE 97-4, PageID # 3892-3918.

In 2003, the governments of Jefferson County and the City of Louisville merged pursuant to KRS Chapter 67C. The combined city and county government ("Louisville Metro") is a political subdivision of the Commonwealth of Kentucky. In 2004, Louisville Metro, through its newly constituted Metro Council, enacted an antidiscrimination law as Metro Ordinance Chapter 92. The law begins with the following declaration of policy:

> It is the policy of the Metro Government to safeguard all individuals within Jefferson County from discrimination in certain contexts because of race, color, religion, national origin, familial status, age, disability, sex, gender identity, or sexual orientation. Certain practices must be prohibited within the areas of employment, housing, public accommodation, resort or amusement as necessary to protect individuals's [sic] personal dignity and insure [sic] freedom from humiliation; to make available to Jefferson County all full productive capacities; to secure Jefferson County against strife and unrest which would menace its democratic institutions; and to preserve the public safety, health and general welfare.

Louisville Metro Ordinance § 92.01.

Louisville Metro formed a Human Relations Commission ("HRC") with two boards: Enforcement and Advocacy. Pursuant to Louisville Metro Ordinance §§ 32.760-761, members of the Enforcement and Advocacy boards are appointed by Louisville's Mayor with approval of Metro Council, and "shall include persons who are representative of the several social, economic, cultural, ethnic, and racial groups that comprise the population of Metro Louisville." RE 97-5, PageID # 3920-3921. Individuals are not compensated for service on the HRC boards. Louisville Metro

Ordinance §§ 32.760(B)(3), 32.761(A)(3). *Id.* In addition to Louisville Metro, Nelson named as Defendants in this litigation both HRC-Enforcement and HRC-Advocacy, as well as all individual members of the HRC-Enforcement board in their official capacities, but later abandoned claims against those Defendants except for her claim against HRC-Enforcement under KRFRA. *See* Verified Complaint, RE 1, PageID # 5-6; Opinion & Order, RE 130, PageID # 5358.

HRC-Enforcement is responsible for enforcing Louisville Metro's antidiscrimination law. *See* Louisville Metro Ordinance §§ 32.760(C), 92.08-09. HRC-Enforcement has a statutory mandate to first seek compliance through conciliation efforts, which often involve educating the alleged offender about Louisville's antidiscrimination law. *See* Louisville Metro Ordinance § 92.09(E)(2). The Ordinance is enforceable through injunctions and modest civil fines, but not as a crime. Louisville Metro Ordinance § 92.08 (incorporating remedies from KRS 344.230). Since Louisville Metro's antidiscrimination law has been enacted, HRC-Enforcement has investigated numerous complaints of discrimination on the basis of sexual orientation, as reflected by publicly available statistics. *See*, *e.g.*, HRC Annual Reports from 2012-2014, RE 97-6, PageID # 3922-3965. However, no one has ever been investigated or sanctioned under the Ordinance for refusal to provide services to a same-sex wedding.

6

## II.    Nelson's Attempt to Manufacture Standing

Nelson alleges a religious objection to providing photography services for same-sex weddings. Nelson started her photography business in 2016 and advertised her religious beliefs for years without directly stating that she would refuse services relating to a same-sex wedding. Deposition of Chelsey Nelson ("Nelson Tr."), RE 97-7, PageID # 3979-3981, 3992-3993, 3999. Before receiving advice from counsel, Nelson's website described her as having a "heart for Jesus" and under the heading "I believe" stated: "I believe God's vision for marriage is beautiful" and "I believe in spreading the truth and love of Jesus." RE 97-7, PageID # 3999.

Although Nelson alleges that providing paid photography services at a wedding requires her to participate in a religious ceremony, that is not the service that Nelson sells to her customers. Nelson's standard form contract requires her to take and edit photographs of the wedding, but does not require her to participate in the wedding ceremony in any respect. *See* Wedding Celebration Services Agreement, RE 97-8, PageID # 4004-4010. Indeed, Nelson's contract explicitly states that she "will not provide Services in a manner that communicates messages contrary to [her] religious beliefs and artistic judgment." *Id.* at PageID # 4007.

Nelson has never been asked to photograph or provide any services with respect to a same-sex wedding and therefore has never had occasion to refuse services to a same-sex couple. *Id.* at PageID # 3983, 3989. Nelson has only ever

professionally photographed 6 weddings as primary shooter and 5 weddings as a second shooter for other photographers. No discrimination complaints have ever been filed against Nelson and she has never been investigated by Louisville Metro's Human Relations Commission. Nelson never contacted Louisville Metro or HRC to request a religious exemption to Louisville's antidiscrimination law. Indeed, Louisville Metro had not heard of Nelson before she filed this lawsuit. *See* Affidavit of Kendall Boyd, RE 97-9, PageID # 4013.

Plaintiffs' counsel, the Alliance Defending Freedom ("ADF"), recruited Nelson to become a plaintiff in this litigation by initiating contact with her in 2018 and providing legal advice to Nelson regarding changes to her website marketing statement. Nelson Tr., RE 97-7, PageID # at 3987-3991. It was only after ADF provided this legal advice that Nelson's marketing statement included a direct statement that she would refuse to provide services relating to a same-sex wedding, a clear violation of the Publication Provision. *See* Ex. 1 to Verified Complaint, RE 1-2, PageID # 58 ("I don't photograph same-sex weddings . . . .").

Nelson did not immediately post this revised marketing statement to her website. Instead, she filed it as an exhibit to the Complaint in this litigation as part of an effort to allege that Plaintiffs have standing to challenge the constitutionality of Louisville's antidiscrimination law. *See* RE 1-2, 1-3. Nelson's Complaint alleges that she wanted to grow her business by more directly advertising her religious

8

objections to providing services for same-sex weddings, but that the threat of prosecution for violations of Louisville's antidiscrimination law was preventing her from taking that step, which caused her to lose business opportunities. *See* Verified Complaint, RE 1, PageID # 26-27, 30, 36.

In fact, Nelson was scaling back her photography business at the time she filed the Complaint. She admitted she no longer offered family and birth photography sessions and had chosen instead to focus exclusively on wedding photography. Nelson Tr., RE 97-7, PageID # 3985-3986, 3996, 3998. This coincided with the birth of Nelson's daughter and her decision to quit her full-time job at a payment processing company to spend more time at home with her daughter. *Id.* at PageID # 3971-3973, 3997. This downsizing of Nelson's business occurred before she filed this litigation.

Since filing the Complaint on November 19, 2019, Nelson has photographed just two weddings, one in the same month the Complaint was filed and a second in June 2021. Since Nelson obtained an injunction from the District Court in August 2020 [RE 47], which allowed her to post the version of her marketing statement which directly states that she would refuse to provide services for a same-sex wedding, Nelson has booked just one wedding client, who was married in June 2021. Apparently, Nelson's freedom to advertise her discriminatory intent has not led to the growth in her business that she claims to have anticipated.

### III.    Procedural History

Nelson filed the complaint in this matter on November 19, 2019, asserting claims under the free speech, free exercise, and establishment clauses of the First Amendment, the Fourteenth Amendment due process clause, and KRFRA. RE 1. On August 14, 2020, the District Court entered a Memorandum Opinion & Order granting in part Louisville Metro's motion to dismiss by dismissing Nelson's claims for damages. RE 47, PageID # 1202, 1211-1212. The District Court granted in part Nelson's motion for a preliminary injunction by prohibiting enforcement of the Ordinance against Nelson on grounds that Nelson was substantially likely to succeed on her free speech claim. *Id.* at PageID # 1203.

The parties thereafter engaged in discovery and filed cross motions for summary judgment. RE 92; RE 96. On August 30, 2022, the District Court issued an Opinion & Order which granted Nelson's motion for summary judgment on her claims under the First Amendment's free speech clause and KRFRA. RE 130. The Court did not decide Nelson's claims under the First Amendment's religion clauses or Nelson's facial challenge to the Unwelcome Clause. *Id.* at PageID # 5390-5391. The Court granted in part Louisville Metro's motion for summary judgment by dismissing Nelson's claims against the individual defendants and the Advocacy Commission and all claims against the Enforcement Commission except Nelson's claim under Kentucky's Religious Freedom Restoration Act. *Id.* at PageID # 5358.

The Court granted Nelson's motion to exclude the expert testimony of Professor Barak-Corren. *Id.* at PageID # 5383-5387.

The District Court converted the preliminary injunction entered against Louisville Metro into a permanent injunction which prohibits enforcement of the Ordinance against Nelson and declares that the Ordinance violates Nelson's freedom of religion under KRFRA. *Id.* at PageID # 5396. The Court entered Judgement in favor of Nelson on September 2, 2022. RE 132. On September 29, 2022, Louisville Metro filed a timely notice of appeal. RE 134. On October 10, 2022, Nelson filed a notice of cross-appeal. RE 137.

## SUMMARY OF THE ARGUMENT

The District Court's summary judgment and permanent injunction enjoining application of Louisville Metro's antidiscrimination law to Nelson's wedding photography business based on her religious objection to same-sex marriage must be reversed for lack of standing. Nelson has never been asked to photograph a same-sex wedding, has not been targeted with any enforcement action, and has not articulated any credible threat of enforcement. The District Court's holding that Nelson has standing based on general, non-criminal enforcement provisions in the Ordinance erroneously collapses the two-pronged analysis required by the U.S. Supreme Court to demonstrate pre-enforcement standing into a single question: does the plaintiff intend to violate a statute? Courts should decline to adjudicate

hypothetical abstract disputes, such as this, because the factual nuances of any actual violation of the Ordinance would be relevant to the Court's analysis of Nelson's claims for violation of her rights under the First Amendment and KRFRA.

The Ordinance is an example of a generally applicable antidiscrimination law which regulates commercial conduct by prohibiting businesses from refusing to sell goods or services they offer to the general public to individuals based on their protected class. Laws prohibiting discrimination by public accommodations have traditionally been upheld, despite religious objections to providing goods and services on an equal basis. The Ordinance regulates Nelson's conduct, not the content of her speech or her religious observance. Any burden on Nelson's speech or religion is incidental and not substantial, as required for Nelson to succeed on her claims under the First Amendment and KRFRA.

The Court should apply rational basis review, which is easily satisfied by the Ordinance's widely accepted nondiscrimination goals. Even if the Court applies strict scrutiny, the Ordinance must be upheld because it is narrowly tailored to accomplish its compelling interest in ensuring the citizens of Louisville Metro equal access to goods and services. The Ordinance avoids any burden on expressive conduct and religion that does not precisely correspond to the business's refusal to provide equal access.

Louisville Metro acknowledges the pendency of *303 Creative LLC v. Elenis*, Case No. 21-476, before the U.S. Supreme Court, which is expected to issue a ruling on the certified question of "[w]hether applying a public-accommodation law to compel an artist [a wedding website business] to speak or stay silent violates the Free Speech Clause of the First Amendment" (*303 Creative LLC v. Elenis*, 142 S. Ct. 1106 (2022)) in May or June 2023. For the reasons set forth in Louisville Metro's motion to hold briefing of this appeal in abeyance pending the Supreme Court's ruling in *303 Creative*, which was denied, Louisville Metro respectfully reserves its right to submit additional briefing of the questions raised by this appeal following the Supreme Court's ruling.

## ARGUMENT

## I.  The District Court Erred in Deciding that Nelson Has Standing to Pursue Her Claims.

Questions of standing are reviewed *de novo*. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022).

"Under Article III, federal courts do not adjudicate hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). To establish standing, it is the plaintiff's burden to show (1) that she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Nelson has not

experienced any actual injury. No discrimination complaints have been filed against her. Nelson never asked Defendants/Appellants to grant her a religious exemption from compliance with the antidiscrimination law. Defendants/Appellants had never even heard of Nelson before she filed this lawsuit. This is a manufactured pre-enforcement challenge premised on speculative fears that Nelson "might" at some hypothetical future date be subject to an enforcement action.

In such cases, plaintiffs must establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). Nelson's "allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes." *McKay v. Federspiel*, 823 F.3d 862, 868-69 (6th Cir. 2016). To prove a substantial threat of prosecution, Nelson must also establish "some combination of the following factors: (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; and/or (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *Id.* at 869 (citations omitted); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164-67 (2014) (holding that pre-enforcement standing was appropriate where plaintiff had already experienced

14

enforcement action in past election cycle and intended to engage in the same conduct in future elections).

Although Louisville Metro actively enforces its antidiscrimination law, no one has ever been investigated or sanctioned under the Ordinance for refusal to provide services to a same-sex wedding. Nelson has not received any warning letters or any other threat of enforcement whatsoever. And the text of the Ordinance is at odds with any suggestion that it is targeted at individuals like Nelson, i.e. wedding photographers, creative professionals, or those with religious objections. *Plunderbund Media, L.L.C v. DeWine*, 753 Fed. Appx. 362, 371 (6th Cir. 2018) (noting that targeted laws can give rise to standing, but affirming dismissal of pre-enforcement challenge where law was not targeted and plaintiffs failed to establish a credible threat of enforcement). Louisville Metro's antidiscrimination law applies broadly to all public accommodations to ensure that community members have equal access to goods and services. An enforcement agency's intent to enforce a law *generally* does not mean that plaintiff *specifically* faces an imminent threat of enforcement. *Updegrove v. Herring*, 2021 WL 1206805, at *3 (E.D. Va. Mar. 30, 2021).

In finding that Nelson had standing, the District Court wrongly suggested that any member of the public can file a discrimination complaint. RE 130, PageID # 5361. However, under the Ordinance, an individual must be "aggrieved by an

unlawful practice" in order to file a complaint, which must be executed and verified by each complainant. *See* Louisville Metro Ordinance § 92.09. The District Court also relied on HRC's use of testers to investigate whether discrimination is occurring. RE 130, PageID # 5362. However, the evidence before the Court demonstrated that testers are used primarily to test for housing discrimination, and only once—nearly 20 years ago—to test discrimination by a single public accommodation. U.S. Dep't of Housing and Urban Dev't Funding Agreement, RE 64-3, PageID # 1723; Kendall Boyd Deposition, RE 92-7, PageID # 3647, 3650. As such, HRC's limited use of testers does not materially impact the analysis of whether Nelson faces a credible threat of enforcement.

Because Nelson has never once in the history of her business been asked to provide services for a same-sex wedding, the likelihood that Nelson will be presented with an opportunity to deny services for a same-sex wedding—and thereby aggrieve an individual who could file a complaint—can only be described as remote. *See Updegrove*, 2021 WL 1206805, at *3 (observing, in dismissing plaintiff's claims for lack of standing, that wedding photographer challenging antidiscrimination law "has never been approached by anyone seeking his photography services for a same-sex wedding"). This possibility is even more remote considering that Nelson significantly downsized her business before this suit was filed and has and can continue to advertise her religious objections to same-sex

marriage on her website without violating the Ordinance, as long as her statement of belief does not advertise her refusal to photograph same-sex weddings if requested to do so. *See Hyman v. City of Louisville*, 53 Fed. Appx. 740, 744 (6th Cir. 2002) (dismissing for lack of standing the only prior constitutional challenge to Louisville Metro's antidiscrimination law because plaintiff's views with respect to homosexuals were "known in the community," no homosexuals had ever applied to work for plaintiff during the history of his practice, and therefore plaintiff "did not have any real expectation" of being presented with a real-world opportunity to violate the ordinance).

The Ordinance limits the amount of any fines imposed for violations of the law to damages caused by the unlawful practice, including compensation for humiliation and embarrassment, and "costs actually incurred" as a "direct result" of the unlawful practice. Louisville Metro Ordinance § 92.08 (incorporating remedies from KRS 344.230). In practice, violators of the Ordinance generally pay modest sums, if they pay any monetary penalty at all. For example, from July 2013 through June 2014, the two public accommodation complaints that were conciliated by HRC were resolved with $150 plus a $25 gift card in one case and $2,500 in the other case. *See* HRC Annual Report (2013-2014), RE 97-6, PageID # 3955-3956. Several cases involving other forms of discrimination were resolved with no monetary payment whatsoever. *Id.*

The modest civil fines available under the Ordinance plus the absence of any criminal penalties for violations of Louisville Metro's antidiscrimination law severely undermine Nelson's argument for standing. *See Susan B. Anthony List*, 573 U.S. at 166 (declining to hold that the threat of Commission proceedings alone was a sufficient basis for pre-enforcement standing because the "additional threat of criminal prosecution" bolstered plaintiff's standing); *Updegrove*, 2021 WL 1206805, at *5 ("[T]he absence of criminal penalties decreases the severity of potential violations, which in turn decreases the potential chilling effect of the statute. In almost every case where standing was found based on a chilling effect, the plaintiff faced the threat of criminal penalty." (citing cases)). While it is true that criminal penalties are not essential to confer pre-enforcement standing to challenge a statute, there is no precedent in the Sixth Circuit for finding standing to challenge a non-criminal statute without some evidence that plaintiff faced some actual threat of enforcement and/or is the target of the challenged statute. *Compare Fischer v. Thomas*, 52 F.4th 303, 308 (6th Cir. 2022) (plaintiffs had received warning letters and one had been previously investigated for the same conduct); *Platt v. Board of Com'rs on Grievances and Discipline of Ohio Supreme Court*, 769 F.3d 447 (6th Cir. 2014) (plaintiff was in group targeted by statute); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390 (6th Cir. 1987) (same).

In its standing analysis, the District Court emphasized that Louisville Metro's antidiscrimination law has enforcement procedures, i.e. provisions allowing for the filing of complaints and procedures for investigations of allegations of discrimination. *See* RE 130, PageID # 5361 ("the investigative process itself . . . is onerous" and "contributes to the chilling effect"). This is hardly remarkable. If the fact that a statute had an enforcement mechanism was sufficient to confer standing under Article III, courts would not undertake a multi-factored analysis of standing, as all statutes that are subject to constitutional challenge have an enforcement mechanism. But the existence of an enforcement mechanism does not mean that any particular regulated individual faces a credible threat of enforcement. In this case, there are no facts that would support a finding that Nelson *specifically* faces a credible threat of prosecution under Louisville Metro's antidiscrimination law. *Updegrove*, 2021 WL 1206805, at *3. The District Court utterly failed to undertake a specific analysis of whether Nelson—as opposed to any other service provider in Louisville—faces a credible threat of enforcement. *See* RE 130, PageID # 5360-5361 ("Whether and when [Nelson] Nelson herself might actually be fined or punished is less relevant . . . ."); *id.* (finding the fact that Nelson has been the subject of any enforcement action "only marginally cuts against the threat of prosecution"). If Article III's standing requirement is to have any meaning at all in a pre-

19

enforcement challenge, Nelson does not have standing to bring the claims asserted in this lawsuit.

Instead of an actual case or controversy, this litigation is part of a national strategy by Nelson's counsel to manufacture cases to expand religious exemptions to antidiscrimination laws, not just for named plaintiffs but for all who claim their particular religious beliefs compel them to discriminate.[3] In filing these cases, ADF's theory seems to be that any plaintiff who makes the bare allegation of an intent to violate an antidiscrimination law has standing to assert a constitutional challenge to the statute. But that "theory of standing would collapse the credible threat and arguable violation prongs into one." *Updegrove*, 2021 WL 1206805 at *3. Binding Supreme Court precedent requires a separate analysis of whether the plaintiff intends to violate a statute and whether plaintiff faces a credible threat of prosecution thereunder. *Susan B. Anthony List*, 573 U.S. at 159 (A "plaintiff satisfies

---

[3] Indeed, during the pendency of this litigation, ADF has filed nearly identical pre-enforcement challenges to public accommodations laws in New York and Virginia. *See Emilee Carpenter, LLC, et al. v. Letitia James, et al.*, Case No. 6:21-cv-06303 (W.D.N.Y., Judge Frank P. Geraci, Jr.); *Robert Updegrove, et al. v. Mark Herring, et al.*, Case No. 1:20-cv-1141 (E.D. Va., Judge Claude M. Hilton). The ADF-represented plaintiffs' claims were dismissed by the trial court in both cases. *See Emilee Carpenter*, 575 F. Supp. 3d 353 (W.D.N.Y. 2021); *Updegrove*, 2021 WL 1206805. ADF has filed appeals in both cases, which have been held in abeyance pending the U.S. Supreme Court's ruling in *303 Creative*. *See also Telescope Media Group v. Lucero*, 2021 WL 2525412, at *3 (D. Minn. Apr. 21, 2021) (lamenting the litigation of a "smoke and mirrors case or controversy . . . conjured up by [ADF-represented] Plaintiffs to establish binding First Amendment precedent rather than to allow them to craft wedding videos, of which they have made exactly two").

the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, <u>and</u> there exists a credible threat of prosecution thereunder.'" (emphasis added) (quoting *Babbitt*, 442 U.S. at 298). This is exactly the sort of abstract and hypothetical dispute federal courts must not entertain. The District Court's holding that Nelson has standing must be reversed and her claims dismissed for lack of a real case and controversy.

## II. The District Court Erred in Deciding that Nelson's Claims Are Ripe.

Issues of justiciability, including ripeness, are reviewed *de novo*. *Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003).

Ripeness is one of several principles of justiciability predicated on both "Article III limitations" and "prudential reasons for refusing to exercise jurisdiction." *Kentucky Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006). The doctrine is "designed 'to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997).

In light of Nelson's decision to scale down her business and the fact that she has never before been asked to photograph a same-sex wedding, the likelihood that Nelson would ever have an opportunity to deny services to a same-sex couple seeking wedding photography services is extremely remote. In the unlikely event Nelson were asked to photograph a same-sex wedding, details regarding precisely what services Nelson had been asked to provide (photography, editing, and/or blogging), the reasons Nelson declined to provide the service, and the nature of the ceremony itself—such as whether there is any religious component—would be relevant evidence for evaluating Nelson's claims.

The District Court dismissed Defendants' ripeness argument as "merely a prudential rather than a jurisdictional point." RE 130, PageID # 5365. But Nelson's effort to litigate this constitutional challenge in the abstract hinders the Court's evaluation of her arguments. *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S. Ct. 1719, 1723 (2018) (observing that the Court would have benefitted from a more developed factual record, because the details and scope of the baker's refusal to make a cake for a same-sex wedding would impact the First Amendment analysis). This is a case in which prudential ripeness considerations demand restraint, and not the premature adjudication of the abstract dispute manufactured by ADF, which is unlikely to ever come to pass in real life.

III.  **The District Court Erred in Deciding that Enforcement of the Ordinance Violates Nelson's First Amendment Right to Free Speech.**

The District Court's grant of Nelson's motion for summary judgment and legal conclusions regarding Nelson's First Amendment rights are reviewed *de novo*. *Parrett v. American Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993); *Platt*, 769 F.3d at 454.

### A. The Ordinance Regulates Nelson's Conduct, Not the Content of Her Speech.

The Ordinance has a simple objective: to prevent discrimination by businesses that choose to sell their goods and services to the public. What a business chooses to sell to the public remains entirely up to the business. The Ordinance does not interfere with a photographer's choice to offer photographs of a certain style or tone, or the photographer's subjective intent with respect to the feeling the photographs are intended to convey. The Ordinance just requires that the business allow potential customers to decide for themselves whether to hire the photographer, rather than restricting sales based on the customer's protected characteristic. If the photographer turns down a customer because they are homosexual, that violates the Ordinance. Because the Ordinance regulates sales, and not the products or services sold, it regulates conduct—not speech.

The District Court's analysis misunderstands the Ordinance and threatens the existence of antidiscrimination laws which have, for decades, played a vital role in

23

guaranteeing equal access to goods and services without regard to protected class. Public accommodations laws permissibly regulate conduct, even where the businesses engage in activities protected by the First Amendment. *See*, *e.g.*, *N.Y. State Club Ass'n, Inc. v. New York*, 487 U.S. 1, 6-7, 13-14 (1988) (holding antidiscrimination law governing businesses consistent with First Amendment); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 542, 548-49 (1987) (same); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622-28 (1984) (same); *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n.5 (1968) (similar); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 260 (1964) ("[I]n a long line of cases this Court has rejected the claim that the prohibition of racial discrimination in public accommodations interferes with personal liberty.").

Requiring businesses to provide equal access to the services they offer does not burden their expression even when those businesses offer custom or expressive services. In *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) the Court held that a "commercially operated" school's refusal to admit Black students violated federal law prohibiting race discrimination in contracting. *Id.* at 173. In so doing, the Court found that the law's regulation of nonexpressive conduct—offering "educational services" for sale "to members of the general public"—did not interfere with the business's ability to control the expressive content of those services. *Id.* at 175-76. Similarly, requiring a law firm to treat its female and male attorneys equally did not

24

interfere with the expressive activities of its lawyers. *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984).

Distinguishing between expressive and non-expressive conduct ensures that ordinary regulations are not subject to heightened scrutiny simply because a regulated actor wishes to communicate a message. *United States v. O'Brien*, 391 U.S. 367, 376 (1967) (rejecting the view that "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea"). For example, if an individual intends to express disagreement with government policy by refusing to pay income taxes, courts need not apply heightened scrutiny to determine whether the tax code violates the First Amendment, because refusing to pay income taxes is not expressive conduct. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 66 (2006).

The District Court erroneously concluded that Nelson's photography is expressive because viewers would understand the photographs to be a personal endorsement by Nelson of the marriage as consistent with God's design. RE 130, PageID # 5367. Nelson's photography is a far cry from what has traditionally been considered expressive, such as wearing a black arm band to protest the Vietnam War or burning an American flag as part of a political demonstration. In those cases, the expressive nature of such conduct is "both intentional and overwhelmingly

apparent." *Texas v. Johnson*, 491 U.S. 397, 404-06 (1998) (citing *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)).

Wedding photography is a commercial service which provides documentation of a significant day *for the couple* being married. When a restaurant serves a couple celebrating their anniversary dinner, or a bespoke tailor designs a custom wedding dress, no one believes that by doing so the business expresses any endorsement of the customers or their marriages. There, as here, these businesses are just complying with laws requiring equal service. Treating the simple act of service as expressive conduct protected by the First Amendment transforms ordinary commercial transactions into constitutionally protected activity.

Businesses that provide photography services to the public at large are just as subject to generally applicable regulations of their commercial conduct as newspapers and law firms. As the Supreme Court of New Mexico held: where "[a photography business] is a public accommodation, its provision of services can be regulated" consistent with the First Amendment, "even though those services include artistic and creative work." *Elane Photography, LLC v. Willock*, 309 P.3d 53, 66 (N.M. 2013); *see also id.* at 71 ("[T]here is no precedent to suggest that First Amendment protections allow such individuals or businesses to violate antidiscrimination laws."). Thus, even though Nelson's work product involves creative decisions, that "hardly means" that any regulation of its business operations

26

"should be analyzed as one regulating [Nelson's] speech rather than conduct." *FAIR*, 547 U.S. at 62.

The Ordinance's regulation of conduct operates like the antidiscrimination law upheld in *FAIR*. "As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60 (emphasis in original). Though "[t]he law schools object to having to treat military recruiters like other recruiters," the Court held "that regulation of conduct does not violate the First Amendment." *Id.* at 70.

**B. The Ordinance Is Not Content- or Viewpoint- Based.**

The District Court erroneously applied strict scrutiny to the Ordinance based on a determination that the Ordinance is a content-based restriction as applied to Nelson's photography business. However, "federal and state anti-discrimination laws" are "an example of a permissible content-neutral regulation of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *see also Masterpiece Cakeshop*, 138 S. Ct. at 1727; *Bd. of Dirs. of Rotary Int'l*, 481 U.S. at 549 (public accommodations laws "make[] no distinctions on the basis of [an] organization's viewpoint"). Because it is neutral and generally applicable, the Ordinance is subject to rational-basis review. *Church of the Lukumi Babalu Aye Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

The relevant inquiry is not whether application of the law would result in businesses having to create products reflecting content to which they object. The question is whether the *law* draws distinctions based on content. The Ordinance does not. It is an example of a public accommodations law that does not "target speech or discriminate on the basis of its content," but rather has as its "focal point" a "prohibition . . . on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 572 (1995). The Ordinance does not require Nelson to photograph weddings or capture them in any particular way. But once Nelson creates a business to offer a service to the public, she must make that service equally available to all customers.

Nelson insists that the Accommodations Provision, as applied, requires Nelson to depict same-sex weddings "in a positive and uplifting way" because that is how she photographs opposite-sex weddings. But the Accommodations Provision does not concern itself with how Nelson takes photographs. It only prohibits Nelson from denying photography services on the basis that the customer who is getting married is homosexual. Antidiscrimination laws which require the acceptance of "all-comers" are "textbook viewpoint neutral" even if they affect some speakers or messages but not others. *Christian Legal Soc. Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 694-95 (2010);

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 763 (1994) ("[T]he fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based."); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 390 (1992) ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy.").

The subject Ordinance does not compel a "celebratory viewpoint" of same-sex marriage. It prohibits businesses from refusing to provide goods and services on grounds of customers' sexual orientation, regardless of a business's views on marriage or any other subject. *See Roberts*, 468 U.S. at 623 ("On its face, the . . . Act . . . does not distinguish between prohibited and permitted activity on the basis of viewpoint . . . ."). Under the Ordinance, it is just as unlawful to refuse to provide photographs because a couple is heterosexual as it is to refuse to do so because the couple is gay.

The District Court's analysis would invalidate not only Louisville's Ordinance, but all such laws as "viewpoint-based": a law prohibiting race discrimination could be said to favor businesses that support integration, while a law prohibiting sex discrimination could be said to favor businesses that support women's work outside the home. The Supreme Court has rightly rejected that position. *See, e.g.*, *Mitchell*, 508 U.S. at 487; *see also Madsen*, 512 U.S. at 763

(holding that an injunction prohibiting abortion protesters from picketing outside a clinic was not viewpoint discriminatory because "the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based"); *see also Elane Photography*, 309 P.3d at 64 (reasoning that nondiscrimination in public accommodations law does not compel speech because it does not require photography business to "recite any message" or indeed to "take photographs" at all but only to serve customers on an equal basis).

The District Court asserted that the Ordinance "eliminates Nelson's ability to express herself freely on the subject of marriage" and threatens to excise opposition to same-sex marriage from the public dialogue. RE 130, PageID # 5375. The Ordinance does no such thing. The Ordinance does not regulate Nelson's speech about same-sex marriage. She is free to publish on her website or shout from her rooftop that she believes same-sex marriage is immoral, abhorrent, contrary to God's plan, or whatever she wishes to say on the subject. What the Ordinance prevents is Nelson refusing to provide the photography services she offers for sale to the general public to customers based on their homosexuality. "Provisions" like the Ordinance mandating nondiscrimination in public accommodations are "well within the [government's] usual power to enact" and "do not . . . violate" the First Amendment because they "do[] not . . . target speech" but "foc[us]" instead on prohibiting discrimination in the provision of goods and services. *Hurley*, 515 U.S. at 568, 572.

The District Court also latched onto Nelson's statement that she *will* serve LGBT customers so long as the customer is not asking her to photograph their same-sex wedding to suggest that Nelson will not discriminate based on status. RE 130, PageID # 5376. But refusing to sell based on an attribute inextricable from a customer's protected characteristic is discriminatory. *See*, *e.g.*, *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (denying employment to women with young children is gender discrimination); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151 (1970) (refusing to serve a white customer because she was in the company of Black patrons is racial discrimination). In these cases, the business discriminated based on an attribute that was "inextricably bound up with" the person's protected characteristic. *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1742 (2020). Nelson's proposed conduct of refusing to provide services for same-sex weddings is similarly inextricable from refusing to serve a couple based on sexual orientation.

### C. Any Burden on Expression Is Incidental to the Ordinance's Regulation of the Conduct of Providing Goods and Services.

The District Court erroneously found that the Ordinance is subject to strict scrutiny because it compels her to speak in a way that she finds objectionable. The principal basis for the District Court's holding was *Hurley*, 515 U.S. 557.

*Hurley* presented a "peculiar" challenge to the application of an antidiscrimination law to a private association's St. Patrick's Day parade. *Id.* at 572. The private veterans association which organized the parade denied an application

to march in the parade submitted by a group of gay, lesbian, and bisexual descendants of Irish immigrants. *Id.* at 561. *Hurley* is distinguishable because a parade is inherently expressive activity, often used to convey a unified message. *Id.* at 579 (comparing the parade to a speaker who takes to the street corner to express their views). A same-sex couple's wedding is not *Nelson's* parade. Nelson is a photography business offering services to the general public, not a private expressive association. The Accommodations Provision does not require Nelson to speak or to convey any particular message through her photography. The law simply requires Nelson to provide services that she offers to the general public without regard to a customer's sexual orientation.

   *Hurley* itself recognized the difference when it held that public accommodations laws are "well within the [government's] usual power to enact" and "do not . . . violate" the First Amendment because they "do[] not . . . target speech" but "foc[us]" instead on prohibiting discrimination in the provision of goods and services. 515 U.S. at 568, 572. To expand *Hurley*'s holding beyond its application to a private association that wants to control its own message on a parade route would put courts in the impossible "business of deciding which businesses are sufficiently artistic to warrant exemptions from antidiscrimination laws." *Elane Photography*, 309 P.3d at 71.

Far more relevant is *FAIR*, in which the Court rejected a First Amendment challenge to the Solomon Amendment, which required law schools to provide equal access both to military and non-military recruiters on campus. 547 U.S. at 54. A coalition of law schools argued that the Solomon Amendment compelled the schools to endorse the military recruiters' message of discrimination embodied in the Don't Ask, Don't Tell policy. *Id.* at 52-53. The schools specifically objected that they would be required to engage in speech by sending e-mail messages and posting notices on a bulletin board on behalf of the military. *Id.* at 61-62. The Supreme Court rejected the law schools' claim, reasoning that "[a]s a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*," *id.* at 60, and concluded that "[t]he compelled speech . . . is plainly incidental to the Solomon Amendment's regulation of conduct." *Id.* at 62.

By ensuring equal access to commercially available goods and services, the Ordinance does not require Nelson to display or parrot state-sponsored ideologies. *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (First Amendment prohibits a state from requiring a motorist to display the state's motto on his vehicle's license plate); *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 640-42 (1943) (First Amendment prohibits the government from requiring public school students to salute the flag). Rather than requiring businesses to recite or display the Louisville Metro's own

message, the Ordinance instead requires businesses to offer their goods and services for sale on an equal basis.

The District Court's strained analogy to *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) cannot withstand scrutiny. In *Tornillo*, a right-of-reply statute required newspapers that published articles attacking the character of a political candidate to afford the candidate free space for a written reply. The state regulation favored opposing speech in a content-based way: The right of reply was triggered by certain content (editorials critical of political candidates), and the regulation imposed a content-based penalty (replies to the criticism). Here, the Ordinance has merely told all Louisville businesses open to the public that whatever goods and services they offer to heterosexual couples they must also offer to lesbian and gay customers and vice versa. The obligation to serve customers equally is determined by the identity of the customer, not the content of the product. Any effect on speech is entirely incidental.

### D. The Ordinance Satisfies Any Level of Scrutiny.

The District Court erred in applying strict scrutiny[4] to the Ordinance, but it also erred in holding that the Ordinance does not satisfy strict scrutiny analysis.

---

[4] The District Court correctly concluded that the Ordinance would survive rational-basis review, given its widely accepted nondiscrimination goals. RE 130, PageID # 5391.

All agree that Louisville Metro's interest is compelling. "Historical discrimination against homosexual persons is readily apparent and cannot reasonably be disputed." *Love v. Beshear*, 989 F. Supp. 2d 536, 545 (W.D. Ky. 2014). The Supreme Court has repeatedly held that the government has a compelling interest in "eliminating discrimination and assuring its citizens equal access to publicly available goods and services." *See, e.g., Roberts*, 468 U.S. at 624; *see also id.* at 628 (discrimination "cause[s] unique evils that government has a compelling interest to prevent"). No court considering the issue has concluded otherwise.

Public accommodations laws "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley*, 515 U.S. at 572. In *Masterpiece Cakeshop*, the U.S. Supreme Court affirmed that such laws are a "valid exercise of state power," and that it is "unexceptional" that the "law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public." 138 S. Ct. at 1724, 1728.

The Ordinance does not target speech, but rather regulates commercial conduct: the discriminatory sale of products by a business open to the public. The Ordinance allows businesses to choose whatever products and services they want to

offer, and merely requires that a business not deny those goods or services based on a customer's protected characteristic. The Ordinance is therefore tailored to avoid any burden on expressive conduct that does not precisely correspond to the business's refusal to provide equal access.

The District Court pointed to exemptions in other parts of Louisville Metro's antidiscrimination law for small housing rentals and religious organizations to conclude that the challenged Ordinance is both over- and under-inclusive. On the one hand, the District Court lauded these exemptions as an example of the type of exemption that could be provided to Nelson's photography business, while on the other hand criticizing the exemptions as rendering the Ordinance fatally underinclusive. RE 130, PageID # 5379-5383. The provisions of the Ordinance challenged by Nelson contain no exemptions. *See* Louisville Metro Ordinance § 92.05(A) & (B). Louisville Metro's policy choices relating to laws prohibiting other types of discrimination are not relevant to the analysis of Nelson's claims.

Uniform enforcement of the Accommodations Provision is the least restrictive means for furthering Metro's interest in ensuring equal access to goods and services, because every single instance of discrimination in public accommodations renders access unequal, inflicts humiliation, and creates stigma. *See Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) ("[D]iscrimination itself, . . . by stigmatizing members of the disfavored group[,] . . . can cause serious non-economic injuries to those

persons who are personally denied equal treatment solely because of their membership in a disfavored group."); *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (describing "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public" (internal quotation marks omitted)). As the Supreme Court recognized, prohibiting exclusion on the basis of protected classifications "responds precisely to the substantive problem" that anti-discrimination laws seek to address—the denial of equal access to public accommodations—and thus burdens First Amendment rights no more "than is necessary to accomplish that purpose." *Roberts*, 468 U.S. at 629.

The District Court suggested that there would be no problem with providing an exemption to the Ordinance for expressive businesses. But such an exemption would be unworkable, as it is difficult to define what constitutes an "expressive" business. Is a business who makes wedding dresses expressive? What about the company who makes the ring? *See* Excerpts from Transcript of Preliminary Injunction Hearing (Aug. 7, 2020), RE 97-10, PageID # 4019-4023 (dialogue between Hon. Justin Walker and counsel for Nelson, which demonstrates how difficult it would be for Courts, not to mention civil servants tasked with enforcing antidiscrimination laws, to determine whether a business is "expressive"). Application of this type of exemption would invite constitutional challenge to perceived discretionary exemptions and replace the Ordinance's guarantee of equal

treatment with uncertain lines vulnerable to subjective preferences. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1298 (2021).

The District Court also suggested that Louisville Metro could exempt from the Ordinance all businesses relating to weddings or marriage. *See* RE 130, PageID # 5380-5381 (citing approvingly Miss. Code. Ann. § 11-62-5(5)). But the only court to evaluate the constitutionality of that statute concluded that it violates the establishment clause. *See Barber v. Bryant*, 193 F. Supp. 3d 677, 688 (S.D. Miss. 2016) ("the State has put its thumb on the scale to favor some religious beliefs over others"), rev'd, 860 F.3d 345 (5th Cir. 2017) (due to lack of standing).

Nelson does not need an exemption because she has never been and likely never will be asked to provide services for a same sex wedding. But another reason to deny Nelson an exemption from Metro's antidiscrimination law is that such an exemption could lead to an increase in real-world discrimination that would harm same-sex couples in Louisville Metro. Professor Netta Barak-Corren, an accomplished legal scholar and cognitive scientist focused on empirical and behavioral analysis of constitutional and public law, conducted a field experiment during the pendency of the U.S. Supreme Court's decision in *Masterpiece Cakeshop,* which was designed to measure the impact of the Court's decision on wedding vendors' willingness to provide services to same-sex couples (the "*Masterpiece* experiment"). Professor Barak-Corren's Expert Report, RE 97-11, at PageID # 4029.

38

As explained below, the District Court erred when it granted Nelson's motion to exclude Prof. Barak-Corren's expert opinion.

Professor Barak-Corren found that the *Masterpiece* ruling, which was decided in favor of a baker that refused to create a wedding cake for a same-sex couple, significantly reduced the agreement to serve same-sex couples as compared with opposite-sex couples, even among previously willing vendors. *Id.* at PageID # 4030. The *Masterpiece* effect was equally strong in urban areas, which are often assumed to be particularly inclusive of same-sex couples, and did not vary with the political conservativeness of the county. *Id.* However, the effect varies with the religiosity of the environment, such that businesses in areas dense with religious congregations, and particularly Evangelical congregations, like Louisville, Kentucky, were more likely to change their behavior to same-sex couples post-*Masterpiece*. *Id.* Professor Barak-Corren's expert opinion suggests that exempting even one religious objector can embolden even previously willing vendors to refuse services to same-sex couples, which supports Louisville Metro's unwillingness to grant Nelson an exemption to the Ordinance.

By regulating only businesses open to the public, where those businesses are free to choose what goods or services to sell, the Ordinance interferes with Nelson's expression as little as possible while advancing Louisville Metro's interest in equal

access. The Ordinance is therefore constitutional as applied to Nelson. *See Roberts*, 468 U.S. at 628.

### E.  The Free Speech Clause Does Not Protect a Public Accommodation's Right to Publish Its Unlawful Policy of Discrimination.

The Ordinance does not prohibit Nelson from advertising her religious beliefs; only that portion of Nelson's marketing statement which states "I don't photograph same-sex weddings" violates the Publication Provision. Just as there is no constitutional right to discriminate, there is no concomitant right to advertise an illegal policy of discrimination. The U.S. Supreme Court has explicitly disapproved of businesses posting signs saying "no goods or services will be sold if they will be used for gay marriages," as such signs would "impose a serious stigma on gay persons." *Masterpiece Cakeshop*, 138 S. Ct. at 1728-29. In *FAIR*, the Court explained that the government "can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." 547 U.S. at 62. Were it otherwise, longstanding bans on discriminatory advertisements in employment, housing, and public accommodations throughout the country would have to be struck down on free speech grounds. *See, e.g.*, 42 U.S.C. § 3604(c).

The District Court acknowledged that the legality of the Publication Provision rises or falls with the legality of the Accommodation Provision. RE 130, PageID # 5388. The District Court's erroneous conclusion that the Accommodation Provision is unconstitutional as applied to Nelson resulted in its error with respect to the Publication Provision.[5]

## IV. The District Court Erred in Deciding that Enforcement of the Ordinance Violates Nelson's Rights Under KRFRA.

The District Court's grant of Nelson's motion for summary judgment and legal conclusions regarding Nelson's rights under KRFRA are reviewed *de novo*. *Parrett*, 990 F.2d at 858.

The entirety of Kentucky's Religious Freedom Restoration Act is just three sentences:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

---

[5] Nelson also asserted facial and as-applied vagueness challenges to the Publication Provision, but those claims were not decided by the District Court, which granted Nelson the relief she sought via other legal theories. RE 130, PageID # 5389-5390. If Nelson reasserts those claims in her cross-appeal, Louisville Metro will address those theories in its Third Brief.

KRS 446.350. By its plain terms, KRFRA provides a defense to government enforcement activity, not a pre-enforcement cause of action to challenge a generally applicable antidiscrimination law. *Sutherland v. Kentucky Dep't of Corrections*, 2022 WL 17365886, at *3 (Ky. App. Dec. 2, 2022) (to state a cause of action under KRFRA, plaintiff "must first demonstrate that the government *has placed* a substantial burden on the exercise of his religion" (emphasis added)). The statute's examples of burden are government action, i.e. withholding benefits, assessing penalties, or exclusion from programs or facilities. Nelson's religious beliefs have not been substantially burdened because she has not faced any enforcement action and, indeed, has never even been asked by a customer to provide services for a same-sex wedding. Because there has been no government action against Nelson, her claim under KRFRA must fail.

Louisville Metro's antidiscrimination law does not restrict Nelson's religious observance, as was the case in the spate of recent cases challenging Governor Andy Beshear's executive orders restricting church services due to the Covid-19 pandemic. *See*, *e.g.*, *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612-13 (6th Cir. 2020). In those cases, the government regulation was targeted directly at religious observance, obviously burdening the plaintiffs' freedom to exercise their religion. *Id.* at 611 (Kentucky State Police arrived at church parking lot and issued notices to the congregants that their attendance at a drive-in church service amounted

42

to a criminal act in violation of an executive order prohibiting faith-based gatherings). By contrast, the Ordinance is not targeted at any religious beliefs or practices. It is a generally applicable antidiscrimination law.

Even if the Court finds that application of the Ordinance implicates Nelson's rights under KRFRA, the Ordinance satisfies strict scrutiny. The District Court failed to conduct any separate strict scrutiny analysis of Nelson's claim under KRFRA, holding simply that the Ordinance fails strict scrutiny "[f]or the same reasons explained above [in the Court's First Amendment analysis]." RE 130, PageID # 5393. However, in analyzing claims under religious freedom statutes, "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (RLUIPA). "That consideration will often inform the analysis of the Government's compelling interest and the availability of a less restrictive means of advancing that interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 730 n.37 (2014) (federal RFRA).

"The mere fact that the petitioner's religious practice is burdened by a governmental program does not mean that an exemption accommodating his practice must be granted." *South Ridge Baptist Church v. Industrial Com'n of Ohio*, 911 F.2d 1203, 1206 (6th Cir. 1990). The magnitude of the burden must be compared to the costs associated with the government permitting a religious exemption. *United States v. Schmucker*, 815 F.2d 413, 417 (6th Cir. 1987). Here, the burden on Nelson's

religious belief is not substantial. Enforcing the Ordinance against Nelson would not have the purpose or effect of preventing or dissuading Nelson from observing her religious faith. *See Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio*, 699 F.2d 303, 306-07 (6th Cir. 1983). And granting Nelson a religious exemption to the Ordinance would impose significant costs on the citizens of Louisville Metro, who would not have equal access to goods and services offered by Nelson (or other public accommodations who asserts a religious objection in line with the District Court's ruling). Moreover, as evidenced by Prof. Barak-Corren's *Masterpiece* experiment, granting religious exemptions to public accommodations laws increases real world discrimination.

The District Court's erroneous determination that the Ordinance substantially burdens Nelson's religious beliefs and failure to consider the harms associated with providing religious exemptions to generally applicable public accommodations laws requires reversal of the Court's judgment in favor of Nelson under KRFRA.

## V.    The District Court Erred in Granting Nelson's Motion to Exclude Expert Testimony from Prof. Barak-Corren.

A District Court's exclusion of expert testimony is reviewed for abuse of discretion and must be reversed if the District Court bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence. *Kentucky Speedway, LLC v. National Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009) (citations omitted).

### A. Prof. Barak-Corren's Opinion is Sufficiently Reliable.

The District Court abused its discretion by excluding Prof. Barak-Corren's opinion based on a finding that is factually unreliable. RE 130, PageID # 5384-5385 (questioning Prof. Barak-Corren's assumptions and methodology). However, "[a]dmissibility under Rule [of Evidence] 702 does not require perfect methodology." *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 181 (6th Cir. 2009). Weaknesses in an expert's methodology "affect the weight that [her] opinion is given at trial, but not its threshold admissibility." *Id.* (citations omitted). "[R]ejection of expert testimony is the exception rather than the rule." *W. Tenn. Chapter of Associated Builders & Contractors, Inc. v. City of Memphis*, 300 F. Supp. 2d 600, 602 (W.D. Tenn. 2004) (citations omitted).

Respectfully, Professor Barak-Corren—not the District Court—is the expert on how to conduct a social science experiment. She is an accomplished legal scholar and cognitive scientist focused on empirical and behavioral analysis of constitutional law. *See* Professor Barak-Corren's Curriculum Vitae, RE 99-1. She has extensive education and experience in designing and conducting field experiments. Barak-Corren Tr., RE 99-2, PageID # 4231-4232, 4240. Professor Barak-Corren's opinion is largely based on an experiment she conducted, not for purposes of this litigation, but as a natural progression of her education, expertise, and scholarly interests,

which is a hallmark of reliability and admissibility in *Daubert* jurisprudence. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434-35 (6th Cir. 2007).

The District Court criticized the *Masterpiece* experiment for what the Court characterized as struggles to explain the discrimination detected and changes in methodology. Some explanation of the design of the experiment is necessary to illustrate the flaws in the District Court's reasoning. The *Masterpiece* experiment was conducted in four "Waves," two before the Supreme Court announced its decision in *Masterpiece* and two after the decision was announced. Barak-Corren Tr., RE 99-2, PageID # 4252. In Wave 1, vendors were contacted by fictitious same-sex couples and in Wave 2 vendors were contacted by fictitious opposite-sex couples. *Id.* In the post-*Masterpiece* Wave 3, fictitious same- and opposite-sex couples were allocated randomly to contact the vendors, and then in Wave 4 that allocation was reversed, such that each vendor was contacted by both a same- and opposite-sex couple both before and after the *Masterpiece* ruling. *Id.*

There was significant attrition between Wave 1 and Wave 2 of the study, which led Professor Barak-Corren, in consultation with other experts in field studies, to adjust her strategy for Waves 3 and 4 to focus on vendors who had indicated their agreement to serve same-sex couples in Wave 1, to randomize the sequence of whether the vendor was first contacted by a same- or opposite-sex couple, and to make slight adjustments to the language and specificity with respect to wedding date

used to make the request for services. Barak-Corren Tr., RE 99-2, PageID # 4253-4254.

The District Court criticized that in Wave 2 of the *Masterpiece* experiment, non-responses were assumed to be attrition, whereas non-responses in Waves 3 and 4 were coded as negative responses. The District Court points out that a vendor could have many reasons for failing to respond to the inquiries in the *Masterpiece* experiment and argues that Professor Barak-Corren should not assume those reasons are discriminatory. Professor Barak-Corren acknowledges that non-responses could be due to a variety of non-discriminatory reasons, which is why she does not interpret a non-response by any individual vendor as an indication of discrimination. Barak-Corren Tr., RE 99-2, PageID # 4258-4259. Professor Barak-Corren's conclusions with respect the *Masterpiece* effect are drawn from systemic differences she observed in how wedding vendors responded to identical inquiries from same- and opposite-sex couples, not isolated instances of non-responses.

Professor Barak-Corren acknowledges the possibility that attrition from Wave 1 to Wave 2 of the experiment could mean that there was reverse discrimination against opposite-sex couples before *Masterpiece*, but believes it is far more likely that other factors caused the attrition. Barak-Corren Tr., RE 99-2, PageID # 4258; JLS Paper, RE 99-3, PageID # 4381-4382 (attrition is very common in studies that repeatedly measure the same respondents over time; Professor Barak-Corren

investigated the attrition by conducting a random telephone survey, which suggested that businesses that provided no response in Wave 2 were generally less responsive than other businesses, rather than suspicious or email fatigued).

As Professor Barak-Corren explained at her deposition, field experiments very commonly code non-responses as a negative response to a request for services because a non-response is the most common way to provide a negative response, since writing an explicitly negative response is time costly and can be awkward. Barak-Corren Tr., RE 99-2, PageID # 4258 (citing work by Marianne Bertrand, Sendhil Mullainathan, and Nobel Laureate Esther Duflo). It is more difficult to interpret non-responses when inquiries are not randomized, as was the case in Waves 1 and 2 of the *Masterpiece* experiment, which is why Professor Barak-Corren draws no inferences from non-responses in Waves 1 and 2. *Id.* But that did not hinder her ability to investigate systematic differences in Waves 3 and 4, where the inquiries were randomized as between same- and opposite-sex couples. *Id.* ("whatever reasons . . . businesses have for not responding, they should spread randomly and therefore equally across couple types"). The fact that non-responses did not distribute equally across couple types supports Professor Barak-Corren's finding of the *Masterpiece* effect.

The District Court speculated that differences between specificity and requests for in-person meetings in Waves 1/2 inquiries compared to Waves 3/4 may

have depressed response rates. Professor Barak-Corren explained the reasons for these changes at her deposition, including that she was attempting to avoid arousing suspicion on the part of the vendors, which would have been a greater risk if the emails had been identical between Waves 1/2 and Waves 3/4. Barak-Corren Tr., RE 99-2, PageID # 4263. Those differences are not material to the results of the experiment, which did not look only at how vendors changed their response to same-sex couples before and after *Masterpiece*. Barak-Corren Tr, RE 99-2, PageID # 4261 (If Professor Barak-Corren had looked only at that, her inference of discrimination "would have been much larger, but . . . less precise."). Instead, Professor Barak-Corren examined how vendors' responses differed to identical inquiries from same- and opposite-sex couples after the *Masterpiece* decision was rendered. *Id.* Changes to the inquiries from Waves 1/2 to Waves 3/4 do not impact the results of the experiment because those differences were distributed equally across couple types. *Id.*

The District Court also criticizes Professor Barak-Corren's *Masterpiece* experiment for assuming that wedding vendors in the survey knew about the Court's ruling. As a practical matter, because this was an actual field study, rather than a survey of respondents who knew they were participating in an experiment, it was not possible to examine what media sources the vendors consumed before or after the *Masterpiece* decision. Moreover, prior studies have demonstrated that court

decisions shape public opinion indirectly even among individuals who did not read the decision, consume any media regarding the decision, or otherwise became specifically aware of the decision. Barak-Corren Tr., RE 99-2, PageID # 4247; Margaret E. Tankard & Elizabeth Levy Paluck, The Effect of a Supreme Court Decision Regarding Gay Marriage on Social Norms and Personal Attitudes, 28 PSYCH. SCI. 1334, 1340 (2017), RE 99-4 (finding that Supreme Court's decision in *Obergefell* affected public opinion regarding same-sex marriage in a way that was unrelated to frequency of media consumption).

The District Court also suggests that the *Masterpiece* effect is irrelevant to this case because the decision did not grant a religious exemption to antidiscrimination laws, but instead found that enforcement authorities were hostile to religion, without reaching the question of whether the vendor in that case was entitled to an exemption. But these nuances are irrelevant to the experiment because the *Masterpiece* decision was broadly reported and understood as a victory for a baker who asserted a religious objection to making a cake for a same-sex wedding. Barak-Corren Tr., 99-2, PageID # 4247, 4272. To the extent the *Masterpiece* decision was characterized narrowly (as applying only in cases of hostility to religion or otherwise limited to the particular facts presented), that would have worked against the *Masterpiece* effect. In other words, if vendors understood the *Masterpiece* decision as a narrow one, they should have been less affected by the

50

decision with respect to their willingness to provide services for same-sex weddings. The fact that Professor Barak-Corren still found a significant *Masterpiece* effect demonstrates the significant impact of the ruling on behavior among wedding vendors.

The District Court's critiques regarding the design of the *Masterpiece* experiment are no basis to exclude Professor Barak-Corren's opinion. *See, e.g., Crouch v. John Jewell Aircraft, Inc.*, 2016 WL 157464, at *21 (W.D. Ky. Jan. 12, 2016) ("This argument must fail because a party's disagreement with inputs into a methodology is generally not enough to have the methodology excluded under Rule 702. Rather, any perceived deficiencies as to inputs are generally proper issues of weight . . ."). *United States v. Sullivan*, 246 F. Supp. 2d 696, 698 (E.D. Ky. 2003) ("While it is true that there are scientists who disagree with those theories, *Daubert* does not require universal acceptance—only general acceptance. That some scientists in a field disagree with an expert's theories or conclusions does not render those theories or conclusions unreliable under *Daubert*."). The District Court abused its discretion when it decided that Prof. Barak-Corren's opinions must be excluded as unreliable.

**B. Prof. Barak-Corren's Opinion is Relevant.**

Prof. Barak-Corren's opinion was introduced to respond to Nelson's argument that Louisville Metro must prove a compelling "interest in denying an exception to

just Nelson." *See*, *e.g.*, Motion to Exclude, RE 90, PageID # 2249 (citing *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1881 (2021)). Although the District Court did not adopt Nelson's argument based on *Fulton*, Professor Barak-Corren's opinion remains relevant to the Court's strict scrutiny analysis, which suggests that Louisville Metro should provide exemptions to expressive businesses or businesses which provide goods or services that may be used for a wedding. Prof. Barak-Corren's analysis demonstrates that such exemptions are harmful and lead to increases in real-world discrimination. *See Hobby Lobby*, 573 U.S. at 730 n.37 (evidence of third party harm is relevant to strict scrutiny analysis of claims seeking religious exemptions).

Consideration of social science data by federal courts dates back over a century to the "Brandeis brief" filed in *Muller v. State of Oregon*, 208 U.S. 412, 419 (1908), which relied more on social science data than legal precedent. The U.S. Supreme Court famously embraced social science evidence in *Brown v. Board of Ed. of Topeka, Shawnee County, Kan.*, 347 U.S. 483, 494 n.11 (1954), when it held that the doctrine of "separate but equal" has no place in public education. Following in this tradition, there is nothing unusual or improper about Louisville Metro introducing the expert opinion of Professor Barak-Corren, a distinguished scholar and scientist. The District Court abused its discretion in refusing to consider Professor Barak-Corren's opinion and the *Masterpiece* experiment, which shows

that even an individual exemption can have a significant and robust impact on a market and its customers.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's grant of summary of judgment to Chelsey Nelson, vacate the injunction entered by the District Court, and remand the case to District Court with a direction to enter judgment in favor of Louisville Metro, dismissing Chelsey Nelson's claims with prejudice.

Respectfully submitted,

/s/ Casey L. Hinkle

Casey L. Hinkle
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main Street, 4th Floor
Louisville, KY 40202
(502)-416-1636
chinkle@kaplanjohnsonlaw.com

John F. Carroll, Jr.
ASSISTANT JEFFERSON COUNTY ATTORNEY
MICHAEL J. O'CONNELL
JEFFERSON COUNTY ATTORNEY
200 South 5th Street, Suite 300N
Louisville, KY 40202
(502) 574-6321
john.carroll2@louisvilleky.gov

*Counsel for Defendants-Appellants
and Cross-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set in the Court's December 14, 2022 briefing letter, because it contains 12,260 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Casey L. Hinkle
*Counsel for Defendants-Appellants
and Cross-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2023, I filed the foregoing with the Court and served it upon opposing counsel by submitting it through the Court's CM/ECF system. All counsel of record are registered ECF users.

/s/ Casey L. Hinkle
*Counsel for Defendants-Appellants
and Cross-Appellees*

**ADDENDUM**

The following are hereby designated as relevant documents from the trial

court record:

| Docket No. | Description | Page ID # |
|---|---|---|
| 1 | Verified Complaint | 1-53 |
| 1-2 | Exhibit 1 to Verified Complaint, Same Sex Wedding Statement | 57-58 |
| 1-3 | Exhibit 2 to Verified Complaint, Same Sex Editing Statement | 59-60 |
| 47 | Memorandum Opinion & Order | 1202-1228 |
| 64-3 | US Dep't of Housing and Urban Dev't Funding Agreement | 1712-1725 |
| 90 | Motion to Exclude | 2220-2252 |
| 92 | Plaintiffs' Motion for Summary Judgment | 2793-2798 |
| 92-7 | Kendall Boyd Deposition | 3647-3650 |
| 96 | Defendants' Motion for Summary Judgment | 3809-3810 |
| 97-1 | Louisville Metro Ordinance § 92.01, *et seq.* | 3848-3860 |
| 97-2 | Excerpts from HRC Annual Reports from 1985-1993 | 3861-3879 |
| 97-3 | Excerpts of Citizen Testimony | 3880-3891 |
| 97-4 | Jefferson Fiscal Court Ordinance No. 36, Series 1999 | 3892-3918 |
| 97-5 | Louisville Metro Ordinance §§ 32.760-761 | 3919-3921 |
| 97-6 | HRC Annual Reports from 2012-2014 | 3922-3965 |
| 97-7 | Excerpts from Deposition of Chelsey Nelson | 3966-4002 |
| 97-8 | Wedding Celebration Services Agreement | 4003-4010 |
| 97-9 | Affidavit of Kendall Boyd | 4011-4015 |
| 97-10 | Excerpts from Transcript of Preliminary Injunction Hearing (Aug. 7, 2020) | 4016-4023 |

| Docket No. | Description | Page ID # |
|---|---|---|
| 97-11 | Professor Barak-Corren's Expert Report | 4024-4153 |
| 99-1 | Professor Barak-Corren's Curriculum Vitae | 4213-4223 |
| 99-2 | Professor Barak-Corren's Deposition Transcript | 4224-4275 |
| 99-3 | JLS Paper | 4381-4382 |
| 99-4 | Margaret E. Tankard & Elizabeth Levy Paluck, The Effect of a Supreme Court Decision Regarding Gay Marriage on Social Norms and Personal Attitudes, 28 PSYCH. SCI. 1334, 1340 (2017) | 4406-4417 |
| 130 | Opinion & Order | 5353-5396 |
| 132 | Judgment | 5397 |
| 134 | Notice of Appeal | 5403-5405 |
| 137 | Notice of Cross-Appeal | 5409-5411 |